**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**
**GREENBELT DIVISION**

KNUTH GOLF, INC,
506 Goodland Place
Rockville, Maryland 20850

and

STEPHEN TRATTNER
506 Goodland Place
Rockville, Maryland 20850

Plaintiffs,

v.

ACTION MEDIA, INC.
10850 Dover Street
Suite 500
Westminster, Colorado 80021

and

MICHAEL BILLINGSLEY
10850 Dover Street
Suite 500
Westminster, Colorado 80021

Defendants.

CASE NO.

## COMPLAINT

Plaintiffs Knuth Golf, Inc. ("Knuth Golf") and Stephen Trattner ("Trattner") (collectively, "Plaintiffs") for their Complaint against Defendants Action Media, Inc. ("Action") and Michael Billingsley ("Billingsley") (collectively "Defendants"), allege as follows:

## THE PARTIES

1. Plaintiff Knuth Golf is a Maryland corporation having its principal place of business in Montgomery County, Maryland.

2. Plaintiff Trattner is a resident of Montgomery County, Maryland.

3. Defendant Action Media, Inc. ("Action") is a Colorado corporation, having its principal place of business in Broomfield County, Colorado.

4. Defendant Mike Billingsley ("Billingsley") is a resident of Broomfield County, Colorado.

## JURISDICTION AND VENUE

5 This is an action for Breach of Contract, Fraud, Threat to Injure Plaintiffs, and Intentional Infliction of Emotional Distress under the law of Maryland.

6. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based upon diversity of citizenship, as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the Plaintiffs and Defendants. Knuth Golf is a Maryland corporation and Trattner is a Maryland resident. Defendant Action is a Colorado corporation and Defendant Billingsley who is the host of Action's Golf Life TV series also resides in that state. On information and belief, Billingsley is the sole or majority owner of Action.

8. This Court has personal jurisdiction over Defendants because they regularly conduct business in Maryland through Golf Life, a nationwide television program airing on Fox Sports TV and other cable outlets, including MASN2 in Maryland. Golf Life boasts that it reaches 94 million viewers. Action and Billingsley actively direct email marketing to consumers in Maryland and solicit advertisers for broadcast and Internet media, including Plaintiff Knuth Golf which is based in Montgomery County, Maryland.

9. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in Montgomery County, Maryland, and this Court has personal jurisdiction over each of the Defendants. Further, at the time of the acts giving rise to the Complaint, upon information and belief Defendants knew or had reason to know that the primary injury caused by their actions and giving rise to the claims in the Complaint would

be suffered by Plaintiffs in Montgomery County Maryland.

10. In 2018, Knuth Golf launched its new High Heat 257+ drivers, fairway woods and hybrids incorporating a novel technology. This technology that was the first and remains the only one taking advantage of a USGA rule change that allowed drivers and metalwoods to be "hotter" outside the center of the face where amateur golfers hit approximately 50% of the time. This technology was named the 3-Trampoline technology.

11. The new 3-Trampoline technology incorporated into the High Heat 257+ golf clubs earned stellar reviews, including from Mike Billingsley who also stated in a Golf Life episode that he had the High Heat 257+ driver, fairway wood and hybrid in his bag.

12. Many amateur golfers lose significant distance when they hit the turf in the fairway, the rough or the sand in a fairway bunker before hitting the golf ball. In late 2019 Knuth Golf added a novel technology to its fairway woods and hybrids called the Turf Glider Sole that significantly minimizes this loss of distance.

13. Prior to the 2020 PGA Demo Day, Knuth Golf sold some of its new High Heat 257+ metalwoods with the Turf Glider Sole technology, and the customers loved them because they performed as designed.

14. Trattner was excited about the prospect for creating a marketing video featuring golfer testimonials, including capturing their excited reviews like "Oh my God," "Wow!" and similar spontaneous statements when they looked down and saw they hit the turf or rough before hitting the ball and could not believe that they obtained so much more distance. Trattner believed that Golf Life episodes including consumer testimonials with "Wow" like comments would generate much larger total sales than the largest number of sales from any prior Golf Life episode for prior High Heat clubs. Trattner's opinion was supported by Revolution Golf's use of marketing videos with amateur testimonials for just the T-less driver that had a new sole technology that reduced the loss of distance when it hit the turf before hitting the golf ball in the fairway and

produce "Wow" like comments shown in a marketing video that Trattner was informed was a major reason why they sold approximately 4-5 times the combined annual sales for all of High Heat 257+ fairway wood and hybrid sales for 3-4 consecutive years. This caused Trattner to contact Billingsley of Golf Life TV in late 2019 who had created episodes for Knuth Golf in 2018 and earlier in 2019.

15. Billingsley sent Trattner a proposal on November 30, 2019 offering to be a "brand ambassador" for a series of five 90 second episodes. Billingsley referred to them as his January, Preseason (Feb-March), April, May, and June episodes that he valued at $15,000 and four dedicated emails to 100,000 GL subscribers valued at $6,000 as part of a package that included other promotional efforts.

16. For the prior two years, Golf Life had eight episodes shown approximately 45 days. For 2020 Golf Life will have nine episodes broadcast for approximately 40 days. Therefore, the February-March episode started in the second week in February and continued until late March. All episodes in the past two years that Golf Life promoted High Heat 257 clubs referred to as a 90 second episode were priced the same and the Preseason (Feb-March) episode was priced higher because it was for more than two minutes.

17. On December 24, 2019, Trattner sent Billingsley an E-mail seeking a contract for Knuth Golf's new fairway woods and hybrids with its 3-Trampoline and its new Turf Glider Sole technologies. The proposal included Golf Life's February-March Preseason episode as the first of five episodes and the remaining four episodes being April, May, June and July 2020. Trattner's concept for the April, May, June and July episodes was as the brand ambassador Billingsley would feature golfers' testimonials about the new fairway woods and hybrids with the 3-Trampoline and Turf Glider Sole technologies. The first episode, February-March, would be based on videotape at the PGA Show and all episodes would include the benefits of the new Turf Glider Sole technology and include golfers' testimonials. For the remaining four episodes, Trattner stated:

> [The second episode] could be having golfers hit the 3 wood from the fairway, the rough, and fairway bunker, and another episode with golfers hitting the hybrid doing the same but also hitting from a divot with them hitting more greens. Then an episode that focused on the fairway woods with amateurs who were reviewed before they played and then after they played with our fairway woods 3, 5 and 7 could be informative and compelling. Another episode like this one but with just hybrids.

*Id.*

18. Later that same day Trattner sent Billingsley another email referring to the first episode to be shown at the PGA Demo Day:

> [Then] you can add your testimonial, and then you can ask a golfer who we send over to you if they can dig one of our clubs and he will look at you like are you crazy and will come back and say –unbelievable I could not dig it like others have replied to Dean. Add another 3 or 4 golfers who give great reviews.
>
> Think this could be a great first episode that is followed by the next 2 with fairway woods and 2 with hybrids.

19. In reply, Billingsley showed no reservation about the idea of using golfers' testimonials for the final four episodes as Trattner described. On the contrary, as to that idea Billingsley stated, "I like this a lot." . Billingsley's only stated concern was Trattner's proposed golfers' testimonials in the Preseason episode because of the time he would need to take to introduce the new club technology might not leave time to also capture several amateurs hitting the clubs and showing their reactions. Still, Billingsley promised to videotape several golfers' statements and testimonials just in case there was sufficient time to include these in this first episode.

20. Billingsley sent a proposed contract which he had signed for five episodes featuring: 2.5 minutes for the Golf Life preseason episode (February-March); and four 90 second April, May, June, and July episodes including the following content for the episodes: "Mike Billingsley as brand ambassador providing on camera testimonials." In addition, Billingsley added five dedicated emails to 100,000 GL subscribers which Trattner had offered for $3,000. Billingsley included a series of payment dates, including $3,500 on February 12, 2020; $3,250 on March 31, 2020; $3,250

on April 30, 2020; $3,250 on May 31, 2020, $3,250 on June 30, 2020, and $3,000 on July 31, 2020. Trattner signed the contract on January 6, 2020 without requesting a lower price for any episode or making any other revision to the contract that Billingsley sent. Trattner did so because he believed that Billingsley believed in the potential of capturing golfers Wow like moments and did not want to suggest that reducing the price showed any possible reservation on the potential success of proceeding with the contract.

21. Plaintiffs understood the higher price for first payment compared to the same lower price for the next four payments was because the February-March episode was a 2.5 minute episode compare to the next four episodes which were 90 second episodes and each were $3,250; and the last payment for $3,000 reflected the price that Trattner proposed for the five dedicated emails that Action accepted as shown in the Agreement.

22. On information and belief, Defendants had the same understanding as Plaintiffs stated in Paragraph 21 when they both signed the agreement on January 6, 2020.

23. Billingsley completed the first episode, featuring footage and interviews from the 2020 PGA Demo Day, and circulated the footage for review and comment. Billingsley did not videotape any amateur golfers' reactions (the "Wow" moments Trattner had specifically referenced in describing the content for the proposed marketing effort) which he said he would do in case there was time to use them. Supra at ¶19. Although this episode was to run for at least 2.5 minutes, the footage circulated by Billingsley for this episode ran approximately 30 seconds short because he did not videotape any amateur golfer's testimonials that he said he would do before he signed the agreement that could be used to fill the remaining time. Accordingly, in an effort to mitigate Knuth Golf's damages, Trattner requested that Billingsley use approximately 30 seconds of a videotaped commentary of a sports announcer's commentary on the new technology that Plaintiffs had another company take for their website which Billingsley did although he implicitly acknowledged that it was not as good as having amateur golfers' Wow like statements.

24. Knuth Golf approved Action's final version of the first episode in a link of the February-March episode that Trattner reviewed in an email Billingsley sent to him. That approved version included a "call to action" that offered viewers a price savings if they mentioned Golf Life when purchasing Knuth Golf's clubs. Such a "call to action" had been a consistent critical staple of spots produced by Action for Knuth Golf in 2017 and 2018. This prior experience had shown that offering a price savings during Golf Life's episodes can result in a large number of sales, and Billingsley had acknowledged that having this "call to action" was important to Plaintiffs. In addition, Knuth Golf mailed a check in the amount of $3,500 for the first episode on February 17.

25. However, when Plaintiffs viewed the first episode aired on Fox Sports TV the "call to action" that Knuth Golf had approved had been deleted. This unilateral change after approval of the spot was a critical omission, and at odds with the prior course of dealing between Plaintiffs and Defendants. Trattner sent Billingsley an email objecting to this deletion as soon as he saw the first episode went live and asked if the deleted "call to action" could be added with a deletion of the episode elsewhere to keep the total length of the episode for future airings the same because without it sales will be less from golfers who viewed this episode. Billingsley did not deny that he unilaterally deleted the approved call to action but said that he could not change the existing episode. He also trivialized his breach of Action's obligation to have provided Knuth Golf with the opportunity to reduce some other footage in order to have time for inserting the previously approved "call to action."

26. On March 14, 2020, Trattner sent an email emphasizing his expectations for Billingsley to obtain great testimonials for the second episode, but wanting to make sure that Billingsley shot video of images and asked questions as necessary to highlight the effects of the new Turf Glider Sole technology:

> The one thin[g] I regret at the PGA show is that I did not have Jamie record any of the numerous golfers who hit our new metal woods and then say it was great and then I asked them to look down at the turf and close to if not 100% of them said

> WOW or something like that and referred to the fact that they had hit the turf first behind the ball sometimes 2+ inches.
>
> So I am trying to distinguish the statement that Wow I am getting the same distance across the face which would be the result with a clean hit because of our 3 trampoline technology and the result when they hit behind the ball which is the result of the combination of our 3 trampoline technology AND the turf glider sole.

27. On March 14, 2020, Billingsley responded but did not address Trattner's comments about amateur testimonials that he had wanted in the April episode. Instead, Billingsley replied to another statement Trattner made with which he disagreed. On information and belief, Billingsley did not address the subject of golfer testimonials Trattner was seeking because he had no intention to include testimonials for the second episode. In addition, on information and belief Billingsley did not disclose he did not have any intention to videotape testimonials because he was concerned that had he shared that information, Trattner would have advised him not to proceed, since it was the reason Trattner went forward with the contract which expressly called for "On Camera testimonials."

28. In his reply on Sunday, March 14, 2020, Trattner sent Billingsley an email demonstrating that Billingsley's denial was contrary to his prior statements.. Then, Trattner reinforced the importance of including testimonials from amateur golfers in the second episode, including reaction video and commentary, as that type of footage would emphasize the distance benefits of Knuth Golf's new clubs' Turf Glider Sole technology. Trattner added that, "[Incorporating] ['W]ow[,"] expressions should not be difficult as that is the reaction we got all day at the PGA show and we get emails from customers [writing they] are the best clubs ever hit."

29. In his reply on March 15, 2020, Billingsley sent an email to Trattner stating:

> "Fine Steve. It's so fun working with a lawyer. I'll do as you ask. I can't afford your threat and you know it."

30. On information and belief, Billingsley's statement that he would include amateurs' testimonials as Trattner was knowingly false statement because Billingsley had no intention to film amateur golfers for this second episode that he planned to do the following morning.

31. On information and belief, Billingsley lied because if he had told Trattner he did not plan on filming amateur golfers he was concerned that Trattner would have told him to not proceed with the filming, and if there was no time to complete the April episode like he had agreed in the contract then it would move all episodes back one month. His concern was correct because that is precisely what Trattner would have told him.

32. On March 16, 2020, Trattner followed up with Billingsley's statement he would provide testimonials by requesting Billingsley to provide him with information about the clubs he would need for use by the amateur golfers he had lined up for the April episode.

33. Later that day, Billingsley responded, stating, "Our next episode goes out next week. I shot the video today here in Colorado. I'll have a rough cut for you tomorrow. We are not in a position to have testimonials. However, I believe you will like what I've produced."

34. Billingsley's failure to include any amateur testimonials in the April episode constitutes a breach of the plain terms of the contract between Action and Knuth Golf, which expressly promised that Billingsley would act "as a brand ambassador providing **On Camera testimonials."** (*emphasis supplied*).

35. The April episode was shown without any On Camera testimonial only because Billingsley lied to Trattner the day before and Billingsley stated there was no time left for Defendants to create an April episode with the agreed player testimonials. Trattner objected to what Billingsley had done but attempted to mitigate the damages from the breach of the agreement and Defendants' fraud of their intention to comply with the terms of the Agreement by proposing different video than what Billingsley had included in the Defendants' proposed April episode.

36. Knuth Golf did not then terminate the agreement with Action based on its multiple

breaches of the agreement and fraudulent concealment that it had no intend with complying with the terms of the agreement, because Trattner believed (consistent with Billingsley's prior representation made before the parties entered into the contract) that Billingsley really liked the marketing concept "a lot;" had not expressed any reservations, or suggested any other ideas that Trattner had requested in his email in December, 2019; that the three episodes remained to be filmed prior to completion of the contract would generate a lot of business with amateurs golfers' testimonials; and that Billingsley would not lie again and do as required under the agreement.

37. On March 26, 2020, Billingsley sent an email to Trattner with an attached invoice in the amount of $ 3,250. Billingsley's March 26, 2020 email expressly states the attached invoice is for **"Subject: Golf Life April / Invoice**." (Emphasis added.)

38. Plaintiffs understood that the April invoice Billingsley sent was consistent with their understanding of the Agreement (supra at ¶¶20-21) because it was the second of the two scheduled payments for the second episode listed in the Agreement.

39. Trattner authorized the mailing of the second payment on March 27, 2020 for the April Episode, which was before the contractual due date on March 31, 2020. That check was deposited by Action on April 3, 2020.

40. Thus, on April 3, 2020 Knuth Golf had fully paid Action for the first February-March episode and the April episode as required by the contract, and consistent with Action's express request for the payment for the "April/Episode."

41. On April 1, 2020, Trattner reached out to Billingsley again to try to ensure that there was no ambiguity concerning Knuth Golf's expectations for the May episode, which was to be filmed in April. Trattner queried:

NEXT EPISODE

Where were you planning on shooting [the May episode] and will it still be open?

How many amateur golfers did you say you have lined up to test clubs?

> We obviously need to know their [sic] specs so we send you the correct clubs for their testing. See questions stated above.
>
> So, there is [no] misunderstanding on what you will be filming, please provide your objective and plan to achieve it. In this regard, please send us when and where (like starting at hole 14 when course opens you can take what you intend to ask them to do (individually or as a group), when you intend to film them and when interview them—after the shot and when they say for example and they say they liked the distance and then ask them to look down with photography showing they hit behind the ball which a divot left and hopefully you will hear Wow).

42. On April 2, 2020, Billingsley sent an email responding to Trattner's email from the previous day: We have you contracted for a :90 second feature in the upcoming show. As I mentioned, we will find a few people to try out the clubs and interview them. **It is my advice that this is NOT the best use of :90 seconds.** However, if you are dead set on this type of testimonial segment, experience says we will be doing just that. (*Emphasis added*).

43. Plaintiffs concluded that Billingsley had not only concealed his intention to breach the terms of the contract for the April episode by failing to include any testimonials, but that Billingsley had misled them in order to secure the contract in the first instance.

44. Trattner sent an email dated April 2, 2020, advising Billingsley that Knuth Golf was terminating its agreement with Action. Trattner explained:

> I wrote to you on December 31 that we would proceed with a 5 episodes package for $15,000 with the first episode being shot at the PGA show and then 4 more episodes that captured WOW moments from golfers because we believed that this would be an episode that your viewers could identify with and buy our clubs. I wrote 2 episodes would include golfers who played with the fairway woods and 2 episodes who played with the hybrids. In reply on the same day and most importantly to me you wrote you "liked that idea a lot" which is why we proceeded. Then we talked on January 1 and I mentioned that the 4 episodes could [be] broken down with golfers with one each club who had just played that day and one who had played for a week. And again, you liked that idea.
>
> That is why I was very unhappy that when I asked you which clubs you need for the golfers for the first of 4 episodes after the PGA show you replied you had already filmed the second episode with just filming yourself and said I would like it. I was upset to say the least because the whole point of the 4 episodes after the PGA Show we had agreed upon was for golfers who saw your show and they would see other

golfers just like them who loved the benefits of our clubs who was amazed at what a difference our technologies had on their performance- and not the skill you have which is self-evident when looking at your swing.

[Now] you write that you will arrange for a "few" golfers to proceed with what we agreed upon if we insist, but you advise against it which is consistent with your filming the second episode which was contrary to our agreement. Do not know what you mean by a few and do not know if you intend to give them the clubs before the filming or not so they will have had opportunity to play with it at least a few times and you would know what they were going to say, but a few could mean 2 or 3 and if they show up anything is possible and 1 or 2 may not have had a good experience. But even assuming that they did, in your view that this would not be the best use of time provided and had you said that I would [have] declined to proceed because you did not have the same vision I had of what we need.

45. On April 2, 2020, Billingsley replied that this was "not fair" and that he did not accept Trattner's cancellation of the contract. He went on to explain that, contrary to his prior assertions that he "liked a lot" Trattner's concept for the episodes, that Trattner "need[ed] to listen to guidance." Plaintiffs understood Billingsley's reference to his "guidance" was a reference to his prior statement "that utilizing amateur testimonials for a 90-second episode was not "the best use of the time."

46. On April 8, 2020, Billingsley attempted to justify his failure to include customer testimonials in the second episode even more than before as he criticized the value of customer testimonials, stating, "If you think people going 'wow' will sell clubs, you are not paying attention to the times."

47. On information and belief, Billingsley's comments in response to Knuth Golf's cancellation of the contract with Action made plain that his initial statement (when he was attempting to consummate the sale), that, "I like this a lot," was a blatant falsehood intended to secure an agreement with Knuth Golf for multiple episodes.

48. On April 14, 2020, email to Trattner, Billingsley stated, "Once we came to terms and agreement, with 90 second features and new technology, I have extended to you my concern about trying to only use testimonials."

49. Plaintiffs understood Billingsley's statement quoted above in Paragraph 48 as being a clear admission that Billingsley intentionally deceived Trattner in order to secure the agreement he proposed to Knuth Golf.

50. Two days after Trattner advised Billingsley that Knuth Golf was cancelling the remainder of the contract with Action , and one day after Action deposited Knuth Inc.'s March 27, 2020 check for $3,250 for the April episode Billingsley sent an email to Trattner on April 4, 2020 stating that there two "invoices due." The first invoice for $3,250 was a copy of the same invoice Billingsley sent on March 26, 2020 **which he stated in the Re: line it was for " the April /Episode"** which was already paid in full. The second attached invoice dated on April 3, 2020 inexplicably appeared to be seeking a third payment of $3,250 for April episode that was already paid for. Both invoices included a statement that the amount of $3,250 was due now.

51. On information and belief, Defendant Action knew that Knuth Golf did not owe any money on April 4, 2020 because it had deposited Knuth Golf's payment of $3,250 for the April Episode on April 3, 2020 which corresponded to the second payment in the Agreement, and Billingsley knew it was deposited because his wife does the bookkeeping for Action.

52. On information and belief if Billingsley knew that Plaintiff's $3,250 check was deposited on April 3, 2020 in reply to his March 26, 2020 email requesting the same then he knew that the April episode was paid and his statement on April 4, 2020 that money was owed was intentionally false.

53. Assuming that Billingsley was not aware that Knuth Golf's check for the April episode that he had requested on March 26, 2020 was deposited by Action on April 3, 2020, Trattner responded to Billingsley's April 4, 2020 email on the same day disputing Billingsley's claim that any payment was due because Knuth Golf had already paid for the second episode, which was the second payment scheduled in the Agreement. In addition, in this email, Trattner set forth other ways Billingsley caused Action to breach its agreement with Knuth Golf and damages that would offset

Defendants' requests for further payments.

54. Nevertheless, in his reply on April 4, 2020, Billingsley wrote again to Trattner, stating that Knuth Golf owed Action for the April episode which now clearly demonstrated bad faith as he was advised that the payment Billingsley had expressly request for the April episode had been made. In addition, Billingsley stated the reason Plaintiffs was refusing to make a further payment for that episode was because Trattner and or Knuth Golf was "trying to cut losses," which he knew could not be true as Knuth Golf had paid for the April episode.

55. On information and belief, at the time of his second April 4, 2020 email Billingsley knew that Knuth Golf's check for the full amount of the April invoice he had sent on March 26, 2020 and was deposited on April 3, 2020.

56. On information and belief, if and when Billingsley was informed that Knuth Golf's March 27, 2020 check was deposited then Billingsley and Action would have known that there was no basis for his claim that Knuth Golf owed Action for the April episode. Further Billingsley would not have had any basis to state Plaintiff's refusal to pay for the April episode was because Plaintiff "was trying to cut losses."

57. Further, had Trattner been motivated to "cut his losses," he would have requested the prices of the last four episodes to be reduced to the lower price of $ 3,000 for 90 second episodes Billingsley offered to sell them for; or even far less as Billingsley offered to sell one 90 second episode for just $2,000. In addition, Trattner would have requested a credit for (a) Defendants' failure to keep the approved "call to action" for the February- March episode and (b) Defendants' failure to include any "testimonials" required by the party's contract. Alternatively, Knuth Golf could have terminated the contract after Action's breach of its express terms in producing the April episode that failed to include any testimonials, and refrained from making the payment on March 27, 2020 for the April episode based an offset of damages due to Defendants' breaches and fraud in claiming that they will provide the testimonials in the second episode the day before

then intended to videotape the second episode without any testimonials.

58. Plaintiffs have suffered substantial injuries and damages as a result of Defendants' conduct.

**COUNT I**
Breach of Contract (Against Action)

59. Plaintiffs incorporate Paragraphs 1 through 58 inclusive, as if fully set forth.

60. Action and Billingsley willfully breached the contract with Knuth Golf and caused damages, when they deleted a "call to action," and which Plaintiffs approved in the link to February-March episode that Defendants sent to Plaintiffs. This "call to action" lasted about seven seconds and included a verbal and visual reference to Knuth Golf's website and a verbal and visual statement that viewers could save 15% if they mentioned Golf Life during checkout. Defendants' unilateral deletion damaged Knuth Golf, and could have been easily avoided if Billingsley had notified Trattner that he needed to delete seven (7) seconds from the episode which Plaintiffs would have provided other content to be deleted.

61. Defendants stated in reply that Knuth Golf was not damaged because Billingsley left a call to action by the last person in the episode. Defendants' statement equating the two calls to action was in bad faith, because unlike the call to action identified in Paragraph 60, the one call to action Billingsley left in the episode was approximately only 1-2 seconds with no visual of Knuth Golf's website domain name and no oral or visual reference to any savings if the viewers selected Golf Life when placing their order at that website.

62. Action breached the contract with Knuth Golf by failing to include any on camera amateur testimonials in the February-March episode as he agreed to do if there was available time which there was and failed to include any testimonials in the April episode. Action also breached the Agreement by failing to include the call to action with Plaintiffs had approved.

63. Knuth Golf has been damaged as a result of Action's bad faith breaches of the

contract.

**COUNT II**

Fraud (against Action and Billingsley)

64. Plaintiff incorporates Paragraphs 1 through 63 inclusive as if fully set forth herein.

65. In response to Trattner's proposal for a series of episodes focused heavily on consumer testimonials Billingsley (and, therefore also, Action) stated, "I like this a lot."

66. In addition, Action and Billingsley made the quoted statement "I like this a lot" in Paragraph 19 but he stated his only reservation being that he may not have time to include them in the first episode to Trattner.

67. After Billingsley secured an agreement with Knuth Golf, Billingsley stated that using "testimonials" is not the "best use" of time in the episode.

68. On April 9, 2020, Action and Billingsley attempted to justify the view that using testimonials that Trattner had proposed was not a "best use" of the episode in criticizing the value of customer testimonials as follows: "If you think people going "wow" will sell clubs, you are not paying attention to the times." Trattner sent a reply on April 11, 2020, referring to two of the most respected creators of video marketing that "using customer testimonials" is one of the most important ways to create consumer sales and sent third party articles confirming the same.

69. In his April 14, 2020 email to Trattner, Billingsley wrote: "Once we came to terms and agreement, with 90 second features and new technology, I have extended to you my concern about trying to only use testimonials." Thus, there could not by any possible doubt about Action and Billingsley's intent to deceive Plaintiffs in order to obtain the Agreement. Nor is there any doubt that Plaintiffs were deceived, and fully justified in terminating the agreement.

70. On April 4, 2020, Billingsley sent an email to Trattner with the same invoice he sent on March 26, 2020 which Billingsley stated in the Re: line was for the " Golf Life April/ Invoice" and another invoice dated April 4, 2020 for April with each for $3,250 and demanded

payment for both invoices on that date. However, Action knew Billingsley was seeking a double or triple payment for the April episode because it had deposited Knuth Golf's March 27, 2020 check for $3,250 in response to Billingsley's request on March 26, 2020 for that amount to pay the April episode. Further, Billingsley knew after Plaintiffs informed him of that Knuth Golf's March 27, 2020 check was mailed for the April Episode invoice and was deposited so there was no basis for him to continue to claim again Knuth Golf owed any money for the April episode.

71. The two invoices that Billingsley sent with his April 4, 2020 email which both expressly stated were due on receipt was so factually baseless that Billingsley asserted in an email on April 14, 2020 he had never requested an immediate payment on April 4, 2020. But that lie was self-evident because Billingsley's April 14, 2020 email had at the bottom of and email chain his April 4, 2020 email where demanded payment on April 4, 2020 on two invoices for the April with the attached invoices both of which stated that the amount of those invoices for $3,250 was due.

72. In addition, Billingsley claimed in his email dated April 13, 2020 that the contract entered by the parties did not seek payments based on prices of episodes. Instead, according to Billingsley the payments in the Agreement "are for the monthly airings."

73. Billingsley further stated that he " bills all of [the] companies" for the monthly airings and Billingsley emphasized "again is not unique to Knuth Agreement, it is the same for everyone." On information and belief, Defendants' did not bill other third parties for their episodes based on "monthly airings."

74. Billingsley's repeated attempts to justify his continued assertion that Knuth Golf had not paid for the April episode even though he requested a payment for the "April/Episode" on March 26, 2020 email was abusive and in bad faith.

75. The agreement between Knuth Golf and Action proves that Billingsley's statement that he bills on the basis of "airings" that were shown and not episodes was a contrived lie and

could not have been possibly be true **because the first payment under the contract for $3,500 was due on February 12, 2020 which was just a few days after the 2020 February-March episode was shown**.

76. Billingsley's email on March 26, 2020 to Plaintiffs with an attached invoice that expressly states that the requested payment of $3,250 **for the "April episode"** was before the April episode was shown so it could not have been for past airings of the April episode.

77. Further, if the first two payments were for the past airings of single episode of February-March that would have meant that the first episode cost would have been $6,750 which makes no sense. Defendants' claim that the invoices sent are for past "airings" is inconsistent with the Defendants' express statements prior to Plaintiffs' termination of the Agreement, including their statement in Billingsley's March 26, 2020 email that Defendants' bill by the "episode" which is consistent with the reasonable interpretation of the payment schedule in the contract. *Supra* at ¶¶20-21.

78. On information and belief, Defendants knew Billingsley's statement that Action requires payments in other contracts based on "airings " that were shown was false. Further, on information and belief Defendants new explanation was on its face a desperate attempt to keep a baseless claim open so they could continue to threaten to injure Plaintiffs which they did as set forth in Count III.

**COUNT III**

Threat to Injure Plaintiffs, and Intentional Infliction of Emotional Distress (Billingsley)

79. Plaintiff incorporates Paragraphs 1-78 inclusive as if fully set forth herein.

80. Trattner denied that Knuth Golf owed any money in a very long email reply on April 7, 2020, reviewing some of the history of Action's breaches that caused Knuth Golf damages, the fraudulent inducement that provided grounds for termination, and the fact there cannot be any monies owed because Knuth Golf had paid for the April episode that was then running.

81. In reply on April 8, 2020, Billingsley stated Knuth Golf owed money for the April invoice and added his threat to injure Plaintiffs: "The golf business is very small and competitive. I know a lot of these people on the buyer and course side."

82. Trattner had shared with Billingsley that he was experiencing emotional distress due to his adult 38-year-old daughter's fighting for her life against Stage 4 cancer prior to encountering Billingsley's unreasonable, intentionally fraudulent claims and defenses. Billingsley indirectly acknowledged being aware of Trattner's emotional distress in his emails to Trattner continuing to demand payment for bills not due.

83. On information and belief, Billingsley reminded Trattner of his stress with the hope that Trattner would simply pay a fraudulent claim by Action to reduce the added stress caused by Defendants' demands. Billingsley succeeded in imposing more pain and stress, but Trattner would not agree to pay Defendants Action and Billingsley who had defrauded Plaintiffs.

84. Plaintiffs have suffered damages as a result of Billingsley's intentionally demanding money which he knew was not owed, threats to harm Knuth Golf and intentional infliction of emotional distress.

**PRAYER FOR RELIEF**

For all of the foregoing reasons, *inter alia*, Plaintiffs seek a finding that:

1. Action Media, Inc. breached the January 6, 2020 Agreement ("Agreement"), by failing to comply with the terms of the first two episodes;
2. Action Media, Inc. and Michael Billingsley committed fraud in the inducement of the January 6, 2020 contract and his fraud that permitted his to create a second episode in accordance with the terms of Agreement;
3. Action Media, Inc. and Michael Billingsley falsely and fraudulently demanded two monthly payments for the same April episode and continued making fraudulent statements seeking to justify any further payment;
4. Action Media, Inc. and Michael Billingsley threatening to harm Plaintiffs' efforts in the golf industry and intentional infliction of emotional distress to induce Trattner to have Knuth Golf pay a bogus invoice;

5. Action Media, Inc. and Michael Billingsley owe Knuth Golf compensatory damages for their breach of the agreement, fraud, threat to harm and intentional infliction of emotional distress, and punitive damages in the amount exceeding $100,000;
6. That Plaintiffs are entitled to compensatory and punitive damages against Defendants in an amount to be determined at trial;
7. That Plaintiffs are entitled to such other relief that is warranted including a preliminary and permanent injunction to require Defendants to refrain from making any further disparaging, false and misleading comments about Plaintiffs or any other attempts to injure Plaintiffs; and
8. That Plaintiffs are entitled to attorney's fees and costs.

Respectfully Submitted,

Roger C. Simmons, Esq.
Shawn P. Cavenee, Esq
Gordon & Simmons, LLC
1050 Key Parkway, Ste. 101
Frederick, Maryland 21702
(301) 662-9122
Fax: (301) 698-0392
rsimmons@gordonsimmons.com
scavenee@gordonsimmons.com
*Attorneys for Plaintiffs*

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable as of right.

Roger C. Simmons